IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:21-cv-244-ECM |
| | ) | [WO] |
| ROBERT L. CRITES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

This action arises out of an alleged wide-ranging healthcare fraud scheme involving Cloverland Drug, Inc. ("Cloverland"), a compounding pharmacy in Montgomery, Alabama. The Government claims that Defendant Robert L. Crites ("Crites") caused 1,220 false claims to be submitted to TRICARE, a federal healthcare program for United States military personnel and their dependents, in violation of the False Claims Act, 31 U.S.C. § 3729 ("FCA"). Now pending before the Court is the Government's motion for partial summary judgment. (Doc. 146).[1] Crites has not responded, and the time to do so has passed. (Doc. 151). The motion is fully briefed and ripe for review. After careful consideration, and for the reasons explained further below, the motion is due to be GRANTED.

---

[1] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

## I.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1345.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element

of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)–(B).

If the nonmoving party fails to properly address the movant's assertion of fact as required by Rule 56(c), the Court may:  "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

### III.  BACKGROUND

**A.    Procedural History**

The Government initiated this suit on March 23, 2021, by filing its original complaint against Defendants Bart Edmiston, Carl Edmiston, J.R. Vaughn ("Vaughn"), and Crites. (Doc. 1).  On February 4, 2022, the Government filed an amended complaint

(the operative complaint) against these same Defendants plus Louis Orr Priester III ("Priester") and Joy Priester Cherry. (Doc. 52). The amended complaint asserts four counts: presenting false claims (Count I); making false records or statements material to a false claim (Count II); conspiracy to violate the FCA (Count III); and unjust enrichment (Count IV). After a series of settlements, (*see* docs. 84, 114, 123, 156), Crites is the sole remaining Defendant.

Crites, who represents himself pro se, has a spotty track record of participation in this case. Over fifteen months after the original complaint was filed, Crites filed an answer to the amended complaint in which he denied the allegations against him. (Doc. 91). Shortly thereafter, Crites was appointed counsel for the sole purpose of representing him at mediation with the Magistrate Judge. (*See* doc. 94). When mediation failed, Crites resumed representing himself. (*See* doc. 112). The Court entered a Uniform Scheduling Order ("USO") on June 2, 2023.[2] (Doc. 119). The Court amended its USO four times thereafter—and extended the dispositive motions deadline once beyond that—to afford the parties ample opportunity to explore settlement. (*See* docs. 127, 132, 137, 141, 143).

Alas, Crites and the Government did not settle, and on March 26, 2025, the Government filed a motion for partial summary judgment on Counts I and III.[3] (Doc. 146). The Court ordered Crites to respond to the motion on or before April 17, 2025. (Doc. 149). On April 18, 2025, the Government, having learned that Crites retained counsel, moved to

---

[2] Crites participated in the parties' planning meeting. (*See* doc. 118).

[3] The Government has stated that summary judgment on these Counts would provide "all the relief" it seeks. (Doc. 146 at 1 n.1).

extend the briefing schedule by thirty days "to allow the parties to discuss settlement and allow [counsel] to appear in the case and prepare a defense."[4] (Doc. 150). The Court again obliged and extended Crites' response deadline to May 19, 2025. (Doc. 151). However, Crites did not settle or respond. On May 23, 2025, the Government filed its reply. (Doc. 152).

## B.    Facts[5]

At one time, under the ownership of David Saalwaechter ("Saalwaechter"), Cloverland was a traditional compounding pharmacy which marketed its products directly to doctors through salesmen. (Doc. 147-1 at 8:20–23, 10:13–11:20). It conducted most of its business with doctors in central Alabama and filled few, if any, prescriptions for out-of-state patients. (*Id.* at 12:10–19). During this period, Cloverland struggled financially, merely "getting by" as a "day-to-day" operation. (*Id.* at 13:22–25).

But then Priester stepped in. Saalwaechter hired Priester as a salesperson in July 2014. (*Id.* at 16:23–17:1). Priester operated as an independent contractor and was compensated through commissions, which were based on a percentage of net profits from his sales. (*Id.* at 18:13–19:2, 25:2–25). Priester received these payouts even when the prescription was covered by TRICARE or Medicare (*id.* at 18:24–19:2), a practice Saalwaechter acknowledges was unlawful, (*see id.* at 21:7–22:24).

---

[4] Crites' counsel never filed a notice of appearance.

[5] Because Crites has not responded to the Government's motion, the Court considers the Government's proffered evidence "undisputed for purposes of the motion." *See* FED. R. CIV. P. 56(e).

Priester did not run a one-man operation.  He hired and oversaw a number of sales teams working on behalf of Cloverland, using Salesforce to track products sold, prescription claim numbers for TRICARE, amounts billed, net profits, commissions owed, and which sales group was responsible for a sale. (*Id.* at 17:13–24, 22:25–23:7; *see also* doc. 147-2).  One of these sales groups was Extraordinary Scripts, run by Vaughn. (Doc. 147-1 at 27:17–23, 29:4–23; doc. 147-2).

Extraordinary Scripts was an extensive operation on its own.  It had several marketing divisions, including a telemarketing arm which solicited customers for Cloverland nationwide. (*See id.* at 27:17–28:8; *see also* doc. 147-4 at 1).  Rather than market to doctors, Extraordinary Scripts marketed Cloverland's products directly to consumers, specifically targeting customers of TRICARE due to the program's higher reimbursement rates compared to traditional private insurance. (Doc. 147-4 at 1).  If a consumer showed interest, Extraordinary Scripts would collect their insurance information and send it to Cloverland, which would then determine which drugs would be reimbursed at the highest rates. (Doc. 147-5 at 1–2; *see, e.g.*, docs. 147-22, 147-23).

The next step depended on the reimbursement amount.  If the amount was greater than or equal to $1,000, Cloverland would prefill a prescription pad, ensuring that it would fill the prescription, and send the prescription to a friendly telemedicine doctor who would sign off—a process internally referred to as "automatic Telemedicine approval"—and return it to Cloverland to be filled. (Doc. 147-5 at 1–2; doc. 147-23 at 1; *see, e.g.*, 147-7 (prefilling prescriptions without patient information); doc. 147-8 at 1 (forwarding a set of 1,000 prescriptions for precertification)).  If the reimbursement amount was less than

$1,000, Cloverland would refer the prescription back to Extraordinary Scripts to determine whether it was lucrative enough to fill the prescription. (Doc. 147-5 at 1). If it was lucrative enough, the team would follow the same steps as above. (*Id.*) If it was not, a representative of Extraordinary Scripts would attempt "to salvage what they c[ould] from it." (*Id.*) For its services, Extraordinary Scripts was well compensated. The sales group was paid a commission of 45% of the net profits on all prescriptions its salesmen procured. (Doc. 147-9 at 12; doc. 147-10). Saalwaechter and Priester split the rest. (Doc. 147-10).

One of Extraordinary Scripts' salesmen was Crites. (Doc. 147-1 at 28:9–19). Befitting of his sales group's name, Crites was an extraordinary salesman, and he was well aware of the profit-over-patient motive of Cloverland. In one email chain from April 21, 2015, with Crites carbon copied, Saalwaechter and Extraordinary Scripts representatives discussed the need to change ingredients in a compound medication because of "higher rates of reimbursement." (Doc. 147-11). This prompted Vaughn to ask: "How did we miss this[]??? Le[t's] fix it and get paid[]. We are on Tricare['s] good guy list so we have smooth sailing." (*Id.*). Once the formulation was "fixed"—that is, made more lucrative—Crites set to work. From April 23 to April 29, 2015, Crites' sales garnered Cloverland eighteen claims to submit for the new formulation, ultimately costing TRICARE $269,759.31 and netting Cloverland $236,256.06 in profit—$106,315.23 which was paid to Extraordinary Scripts. (Doc. 148-2 at 10–14). Crites also conducted research to ensure Cloverland's scheme would not be discovered by government auditors. In one February 2015 email to several Cloverland personnel, including Saalwaechter, Vaughn noted, "I just talked with [Crites], he now has submitted 50 [prescription requests] . . . all but one are Tricare[]. He

also researched Tricare and Compounding only represents 3% of the Tricare budget[,] so we are not even on their radar with room to grow." (Doc. 147-12).   Saalwaechter was pleased, and replied, "[g]o Robert go." (*Id.*).

Because submitting claims to TRICARE was highly profitable and seemingly undetectable, Crites intentionally focused on veterans and active service personnel—TRICARE members—who lived on or near military bases. (Doc. 147-1 at 28:9–29:3). Like others with Extraordinary Scripts, Crites directed his targets to friendly doctors who would sign off on prescriptions and return them to Cloverland to be filled. (*Id.*).  Crites also ran an operation beyond himself, employing servicemen to market for him on base and paying them 10% of the net profit per prescription procured as commission. (*See* doc. 147-13 at 4–5 (agreement of "Health Secure Plus, LLC" and Brannon M. Polland with Crites listed as C.E.O.); *see also* doc. 147-26 (indicating Crites as the sole owner of Health Secure Plus)).   Eager for their commissions, Crites' marketers doggedly pursued potential customers, sending them prefilled prescription forms or lists of products to choose from and emphasizing that their chosen products would be free, so long as they were on TRICARE.  (*See, e.g.*, doc. 147-14 (stating that products would be free and attaching form that had to be filled out with three items that soldiers would like sent to "TriComRX"); doc. 147-16; doc. 147-17; *see also* doc. 147-15 (indicating Crites as the sole owner of the limited liability company "TriComRX")).

Each time TRICARE paid Cloverland, it did so using checks with detailed remittance information, reference numbers, and dates the underlying prescriptions were filled. (*See, e.g.*, docs. 148-4, 148-14).  Accordingly, the Court does not have to guess how

much damage Crites caused.  In total, he was responsible for 1,213 claims made to TRICARE through Cloverland from February 2015 to January 2016.[6]  These claims were costly for TRICARE but profitable for Cloverland, Extraordinary Scripts, and Crites.  From his work, TRICARE was billed $5,447,474.94, Cloverland made a net profit of $4,169,274.05, and Extraordinary Scripts made $1,821,922.46 in commissions. (*Cloverdale Corporate Reports*).  During this time, Crites' bank statements reveal that he raked in $1,203,137.21 in commissions, netting $876,235.90 after wiring his marketers their cut. (Doc. 148-15).

## IV.  DISCUSSION

The Government has a succinct theory of Count I:

> Commissioned-based reimbursement schemes which induce claims to be made on federal healthcare programs violate the Anti-Kickback Statute [42 U.S.C. § 1320a-7b(b) ("AKS")]. Claims tainted by [AKS] violations are inherently false claims and are unlawful under the [FCA].  Cloverland paid Mr. Crites commissions to induce him to procure clients that allowed Cloverland to present 1,220 claims for reimbursements to TRICARE.  Each of these claims violates the [FCA].

(Doc. 147 at 1–2).  The Court therefore begins by examining the text of the FCA and AKS.

"The [FCA] is the primary law on which the federal government relies to recover losses caused by fraud.  The Act creates civil liability for making a false claim for payment by the government." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (citation omitted).  The FCA reads, in relevant part:

---

[6] (*See* docs. 148-5 (February 2015), 148-6 (March 2015), 148-2 (April 2015), 148-7 (June 2015), 148-8 (August 2015), 148-9 (September 2015), 148-10 (October 2015), 148-11 (November 2015), 148-12 (December 2015), 148-13 (January 2016) [hereinafter *Cloverdale Corporate Reports*])).

> [A]ny person who—
>> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>> (C) conspires to commit a violation of subparagraph (A) [or] (B), . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus [three] times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).  The term "knowingly" means "that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at (b)(1)(A).  It "require[s] no proof of specific intent to defraud." *Id.* at (b)(1)(B).

The AKS "broadly forbids kickbacks, bribes, and rebates in the administration of government healthcare programs." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1272 (11th Cir. 2018).  It prohibits both the receipt and payment of kickbacks when a federal healthcare program foots the bill for a patient's good or service. 42 U.S.C. § 1320a-7b(b)(1)–(2). A violation of the AKS occurs when a defendant (1) knowingly and willfully; (2) pays or receives money, directly or indirectly; (3) as an inducement to get healthcare services of any kind; (4) paid for by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b); *see also United States v. Vernon*, 723 F.3d 1234, 1254 (11th Cir. 2013); *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 698 (11th Cir.

2014).[7]  "[W]ith respect to violations of [the AKS], a person need not have actual knowledge of [the AKS] or specific intention to commit a violation of [the AKS]." 42 U.S.C. § 1320a-7b(h).

Congress' 2010 amendment to the AKS regarding liability reads:  "In addition to the penalties provided for in this section or [§] 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).  "Noncompliance with [the AKS] is a bar to the receipt of [a federal healthcare] payment, and therefore a violation of [that] statute can form the basis of liability under the [FCA] for past [federal healthcare] payments attributable to the violations." *See Bingham v. HCA Inc.*, 783 F. App'x 868, 871 (11th Cir. 2019); *see also McNutt*, 423 F.3d at 1259 ("The violation of the [AKS] and the corresponding submission of claims for which payment is known by the claimant not to be owed [(because of the AKS violations)] make the claims false under sections 3729(a)(1) and (3).").  In other words, "[a]n AKS violation that results in a federal healthcare payment is a per se false claim under the FCA." *See United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017) (citation omitted); *see also Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (similar); *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052–53 (6th Cir. 2023) (requiring "but-for causation" between the AKS violation and a federal healthcare payment to find an FCA violation); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834–35 (8th Cir. 2022) (same); *United States ex rel. Greenfield*

---

[7] Here, and elsewhere throughout this Opinion, the Court cites nonbinding authority.  While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

*v. Medco Health Sols., Inc.*, 880 F.3d 89 (3d Cir. 2018) (requiring "some evidence" less than that for but-for causation).[8]

In sum, tracking the statutes, to prevail on Count I the Government must show that Crites knowingly and willfully received payment from Cloverland in exchange for his procurement and referral of clients for prescriptions which were paid for by TRICARE. If he did so, he violated the AKS. And if the AKS violation resulted in a federal healthcare payment, he also violated the FCA.

Additionally, the Government contends it is owed summary judgment on Count III because Crites knowingly conspired to violate § 3729(a)(1)(A) and § 3729(a)(1)(B) of the FCA. (*See* doc. 52 at 35–37, paras. 156, 161–63; doc. 146 at 1–2; doc. 147 at 21–22). One who "conspires to commit a violation" of either § 3729(a)(1)(A) or § 3729(a)(1)(B) is also subject to FCA liability. 31 U.S.C. § 3729(a)(l)(C). To make an FCA conspiracy claim,

> it must be shown that the conspirators intended "to defraud the Government." Where the conduct that the conspirators are alleged to have agreed upon involved the making of a false record or statement, it must be shown that the conspirators had the purpose of "getting" the false record or statement to bring about the Government's payment of a false or fraudulent claim. It is not necessary to show that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim.

*Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672–73 (2008). The general principles of conspiracy liability apply, and the Government must show "(1) that

---

[8] The Eleventh Circuit has not decided which causation standard applies. One district court in the circuit has determined that but-for causation is *not* required. *United States ex rel. Heller v. Guardian Pharm. of Atlanta, LLC*, 2023 WL 11909741, at *27–28 (N.D. Ga. 2023). However, the Court need not determine the applicable standard because the evidence in this case is sufficient to satisfy either standard.

the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).

## A.    Count I: Presenting False Claims (31 U.S.C. § 3729(a)(1)(A))

The undisputed record evidence establishes that Crites violated the AKS.  Crites began acquiring clients for Cloverland in February 2015, and received kickbacks for each claim submitted to TRICARE—192 claims by the end of March 2015.  He was in the loop on communications where strategies on how to increase reimbursement from TRICARE by changing medication formulations were discussed.  Immediately thereafter, the Salesforce records indicate he increased his marketing efforts, netting 459 claims in April 2015 alone.  Crites even employed his own marketers, paying them separate kickbacks after taking his own cut of the reimbursements from TRICARE.  Crites' marketers indicated keen awareness, as evidenced in emails from March 2015—near the beginning of Crites' involvement—that TRICARE was providing the funding for these pharmaceuticals that would be distributed by Cloverland. (*See, e.g.*, doc. 147-14; doc. 147-16; doc. 147-17).  These uncontroverted facts show that Crites had actual knowledge that he was receiving and paying kickbacks for referrals and arranging for prescriptions that would be reimbursed by TRICARE—that Crites (1) knowingly and willfully; (2) paid and received money, directly or indirectly; (3) as an inducement to get healthcare services of any kind; (4) paid for by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b).

13

The record also shows that the AKS violations resulted in federal healthcare payments. But for Crites' participation in the kickback scheme—in which he and his marketers targeted military personnel and families on Mississippi bases—the 1,213 TRICARE claims recorded in the Salesforce records and accounted for in Crites' bank statements would not have occurred. Therefore, Crites' AKS violations in this case are per se violations of the FCA. Accordingly, the Government is entitled to summary judgment on Count I. *See Hornsby-Culpepper*, 906 F.3d at 1311.

**B.      Count III: Conspiracy to Violate the FCA (31 U.S.C. § 3729(a)(1)(C))**

Here, the undisputed evidence likewise demonstrates that Crites conspired with others to violate § 3729(a)(1)(A) and § 3729(a)(1)(B) of the FCA. Crites was in contact with Extraordinary Scripts personnel, informing them about the low risk of submitting kickback-tainted claims to TRICARE; in the loop about plans to change medication formulations for profitability; and, from February 2015 to January 2016, procuring patients with TRICARE coverage personally and through his own marketers. These actions demonstrate Crites' conspiracy with others and his performance of actions to effect the object of the conspiracy: obtaining kickbacks from insurance claims paid by TRICARE. These same actions evince Crites' purpose was to utilize these kickback-tainted prescriptions "to bring about the Government's payment of . . . false or fraudulent claim[s]," and that he agreed that the statements made in the claims—in this case, the claims themselves—"would have a material effect on the Government's decision to pay." *See Allison Engine*, 553 U.S. at 673. Accordingly, the Government is entitled to summary judgment on Count III. *See Hornsby-Culpepper*, 906 F.3d at 1311.

## C.      Damages

One who violates the FCA[9] "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461)." 31 U.S.C. § 3729(a). These penalties are "mandatory" and must be awarded for "each false claim submitted." *United States v. Killough*, 848 F.2d 1523, 1533–34 (11th Cir. 1988.

Violative claims submitted *on or before* November 2, 2015 (1,017 claims),[10] incur a penalty of $5,500–11,000 per claim. 28 C.F.R. § 85.3(a)(9).  Violative claims submitted *after* November 2, 2015 (196 claims), incur between $14,308 and $28,619 per claim. 28 C.F.R. § 85.5(b).

Adding the penalty ranges together, the Court must impose a penalty of between $8,397,868 and $16,796,324 under the FCA.[11]  The Government is entitled to that amount "plus [three] times the amount of damages which the Government sustains because of the act[s] of" Crites. 31 U.S.C. § 3729.

Regarding the damages suffered, Crites' actions caused the United States to expend $5,447,474.94 from the public fisc to pay TRICARE claims. (*Cloverdale Corporate Reports*; doc. 148-14).  Therefore, the Government is entitled to $16,342,424.82—three

---

[9] The Government does not seek damages under the AKS in its motion for summary judgment. (*See* doc. 147 at 22–24).

[10] The Government incorrectly included six claims for prescriptions the evidence shows were likely made *on* November 2, 2015, (*see* doc. 148-11 at 3), as subject to higher penalties. (*See* doc. 147 at 23; doc. 154 at 1–2).  The Court has properly categorized those claims.

[11] The Court provides a table of the claims, applicable penalties, and totals billed to TRICARE *infra* Appendix A.

times that amount.  Adding this amount to the totaled penalty range, Crites is ultimately liable to the Government for between $24,740,292.82 and $33,138,748.82.    The Government urges the Court to impose the maximum penalties. (Doc. 147 at 24; doc. 154 at 2).

The appropriate penalties within the range calculated are left to the discretion of the Court. *See Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003); *see also Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 124 (2007) ("The [FCA] . . . authorizes federal trial courts to award monetary relief that will afford the Government a base civil penalty amount that can be adjusted, in the court's discretion, up to the statutory ceiling.").  As the Eleventh Circuit has long observed, "[t]ranslating the gravity of a crime [or offense] into monetary terms—such that it can be proportioned to the value of [a fine]— is not a simple task." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021) (alteration in original) (quoting *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999)).  Nonetheless, the Court's analysis here is aided by the fact that the totality of the circumstances, including the seriousness of the misconduct, the scienter, the amount of damages suffered, and the principle of deterrence all point to the imposition of a significant penalty to ensure the Government is made "completely whole." *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551–52 (1943); *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 501 F. Supp. 2d 51, 56 & n.5 (D.D.C. 2007) (noting "[t]hough there is no defined set of criteria by which to assess the proper amount of civil penalties against the defendant, . . . an approach considering the totality of the circumstances, including such factors as the seriousness of the misconduct, the scienter of

16

the defendants, and the amount of damages suffered by the United States as a result of the misconduct is the most appropriate" and collecting cases); *Yates*, 21 F.4th at 1316 ("In the context of the FCA, we also consider the deterrent effect of a monetary award [in considering proportionality].").

Crites was no small player in Cloverland's scheme. Crites' sales resulted in 1,213 claims being submitted to TRICARE. Put bluntly, Crites, aware of the scheme and a conspirator in it, took actions that defrauded the government on 1,213 occasions. Each and every instance of fraud was significant, serving to undermine public confidence in the Government, make the administration of public health programs more difficult, encourage others to defraud the Government's public programs, and impose costs on the Government in vigilance of fraud. *See Yates*, 21 F.4th at 1316 (citations omitted). Nor was Crites an unsophisticated party—he researched TRICARE and thought he could fly under the radar because compounding pharmacy claims were a small part of the program's total expenditures. He created two LLCs and retained his own marketers, whom he paid over $300,000 in commissions. (Docs. 147-13, 147-14, 147-15, 147-16, 147-26). From his kickbacks, Crites pulled in $1,203,137.21, netting $876,235.90 in profit. (Doc. 148-15). The Government expended $5,447,474.94 on the TRICARE claims Crites profited from. Accordingly, the Court imposes a penalty of $14,696,710—making the overall judgment $31,039,134.82. *Cf. Yates*, 21 F.4th at 1314, 1316 (upholding a judgment of "$1.179 million based on $755.54 in actual damages" where the Court imposed the minimum penalty for each of 214 FCA violations). The Court hopes these "'substantial penalties . . .

serve as a powerful mechanism to dissuade' repeated violations of the FCA." *Id.* at 1316 (quoting *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015)).

## V.  CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1. The Government's partial motion for summary judgment (doc. 146) is GRANTED;

2. Judgment will be entered in the Government's favor and against Crites on Counts I and III;

3. The Government is awarded $31,039,134.82 against Crites;

4. Counts II and IV are DISMISSED without prejudice as moot.

A final judgment will be entered in accordance with the Court's Order.

The Clerk of Court is DIRECTED to mail this Memorandum Opinion and Order and the Final Judgment to the address reflected on the docket for Crites.

DONE this 16th day of March, 2026.

        /s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE

**APPENDIX A**

| Period | Claims | Min. Penalty | Max. Penalty | TRICARE Billed[a] |
|---|---|---|---|---|
| Feb. 2015 (doc. 148-5)[b] | 7 | $38,500 | $77,000 | $68,407.18 |
| Mar. 2015 (doc. 148-6)[c] | 185 | $1,017,500 | $2,035,000 | $1,144,158.93 |
| Apr. 2015 (doc. 148-2)[d] | 459 | $2,524,500 | $5,049,000 | $3,482,260.87 |
| June 2015 (doc. 148-7) | 3 | $16,500 | $33,000 | $0 |
| Aug. 2015 (doc. 148-8)[e] | 94 | $517,000 | $1,034,000 | $106,356.00 |
| Sep. 2015 (doc. 148-9) | 118 | $649,000 | $1,298,000 | $142,058.41 |
| Oct. 2015 (doc. 148-10)[f] | 145 | $797,500 | $1,595,000 | $218,130.14 |
| Nov. 1–2, 2015 (doc. 148-11) | 6 | $33,000 | $66,000 | $8,752.89 |
| Nov. 3–30, 2015 (doc. 148-11) | 91 | $1,302,028 | $2,604,329 | $135,138.31 |
| Dec. 2015 (doc. 148-12)[g] | 75 | $1,073,100 | $2,146,425 | $106,743.21 |
| Jan. 2016 (doc. 148-13)[h] | 30 | $429,240 | $858,570 | $35,469.00 |
| **Totals** | **1,213** | **$8,397,868** | **$16,796,324** | **$ 5,447,474.94** |

[a] The Court uses the amounts billed to TRICARE rather than the total billed (which includes copays) because the FCA provides for damages "which the Government sustains." 31 U.S.C. § 3729. To the extent that the Government seeks damages for billing to other insurers, the evidence presented does not establish that Crites violated the AKS with the requisite scienter or conspired to receive and distribute kickbacks from claims to non-TRICARE insurers. Accordingly, the Court excludes those claims as discussed *infra*.

[b] The Government's February 2015 calculations count nine claims, include one Government Employees Health Association ("GEHA") claim ($3,014.88) and one Express Scripts claim ($1,014.50) in the total billed to TRICARE.

[c] The Government's March 2015 calculations count 188 claims, missing the 189 total recorded. The Government's total includes the two Champ VA claims ($4,339.56; $2,664.90), one Express Scripts claim ($1,014.60), and one GEHA claim ($3,014.88) in the total billed to TRICARE.

[d] The Government's April 2015 calculations count 459 claims (there are 460 claims total), despite including $3,014.88 billed for the one non-TRICARE (GEHA) claim. The Court excludes the GEHA claim.

[e] The Government's August 2015 calculations count 96 claims, including one Medicare claim ($194.01) and one "Paid" claim ($0). The Government represents the total billed to TRICARE by Crites was $105,058.01. However, the numbers show that Crites' claims, less the $194.01 Medicare claim, amounted to $106,356.00.

[f] The Government's October 2015 calculations have $218,530.00 billed to insurance, a difference that likely reflects the inclusion of copays billed to patients.

[g] The Government's November 2015 calculations have $144,083.20 billed to insurance. The Government's December 2015 calculations have $106,863.21 billed to insurance. Upon its review, the Court does not find support for those figures which appear to include sales by others or copays.

[h] The Government's January 2016 calculations appear to include copays, which were not billed to TRICARE, providing an amount of $35,510.00.